# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MAUREEN L. RIOPELLE,               Case No. 1:20-cv-266
      Plaintiff,                    Litkovitz, M.J.

     vs.

COMMISSIONER OF              **ORDER**
SOCIAL SECURITY,
      Defendant.

      Plaintiff Maureen L. Riopelle brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits ("DIB"). This matter

is before the Court on plaintiff's Statement of Errors (Doc. 16), the Commissioner's response in

opposition (Doc. 17), and plaintiff's reply (Doc. 18).

## I. Procedural Background

      Plaintiff filed her application for DIB in December 2013, alleging disability since July 3,

2009, due to a spinal cord concussion and contusion, radiculopathies, neuropathies, cervical and

lumbar disc issues and disc degeneration, retrolisthesis in the cervical spine, muscle spasms and

myelopathy, small fiber neuropathy, sciatica, diffuse body pain, and depression. The application

was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was

granted a *de novo* hearing before administrative law judge ("ALJ") Thuy-Anh T. Nguyen, on

March 24, 2016. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ

hearing. (Tr. 56-114). On June 30, 2016, the ALJ issued a decision denying plaintiff's DIB

application. (Tr. 37-55). The Appeals Council denied plaintiff's request for review and

adopted the ALJ's decision as the Commissioner's final decision.

Plaintiff filed an appeal with this Court, and the undersigned issued a Report recommending that the ALJ's decision be reversed and remanded for further proceedings, which the District Judge adopted. *Riopelle v. Comm'r of Soc. Sec.*, No. 1:18-cv-9, 2019 WL 336902 (S.D. Ohio Jan. 28, 2019), *report and recommendation adopted*, 2019 WL 1082472 (S.D. Ohio Mar. 6, 2019). The ALJ was directed on remand to: (1) determine whether fibromyalgia and chronic pain syndrome were severe impairments and whether such impairments imposed additional limitations on plaintiff's functioning; (2) reweigh the medical evidence; (3) reassess plaintiff's credibility; and (4) elicit additional medical and vocational evidence as warranted. *Id.* at *14. Following remand, a second ALJ hearing was held on November 19, 2019. (Doc. 15). Plaintiff appeared at the hearing with counsel, and she and a VE testified at the hearing. (*Id.*). The ALJ issued an unfavorable decision on January 29, 2020, finding that plaintiff was not disabled. (Tr. 1947-65). Plaintiff did not request review by the Appeals Council opting to directly file suit with this Court. This matter is properly before this Court for review.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.  *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] last met the insured status requirements of the Social Security Act through December 31, 2013.

2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of July 3, 2009 through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the [plaintiff] had the following severe impairments: disorders of the spine, disorder of the right hip, fibromyalgia, peripheral/small fiber neuropathy, and central pain syndrome (20 CFR 404.1520(c)).

4.  Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, [the ALJ] finds that, through the date last insured, the [plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. The [plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to humidity, wetness, extreme cold, unprotected heights, or heavy machinery.  She requires a sit/stand option at will defined as sitting for a 30-minute period before requiring a change of position.

6.  Through the date last insured, the [plaintiff] was capable of performing past relevant work as a consultant and editor. This work did not require the performance of work-related activities precluded by the [plaintiff]'s residual functional capacity (20 CFR 404.1565).

7.  The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from July 3, 2009, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(f)).

(Tr. 1953-64).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination.  Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Specific Errors

On appeal, plaintiff alleges four issues: that the ALJ erred by failing to (1) fully account

for her impairments in the RFC determination; (2) properly evaluate the opinions of plaintiff's

treating physicians, Drs. Jacqueline Ward and F. Clifford Valentin; (3) properly evaluate

plaintiff's subjective complaints of pain and credibility; and (4) take into account plaintiff's

impairments and the opinions of her treating physicians when assessing plaintiff vocationally.

(Doc. 16).  In response, the Commissioner argues that the ALJ reasonably evaluated the opinions

of plaintiff's treating physicians, and the ALJ's decision in all other respects is supported by

substantial evidence.  (Doc. 17).

### 1.  Medical records

In July 2009, plaintiff suffered an injury to her spinal cord during a chiropractic manipulation that resulted in myelopathy, an inflammation of the cervical spinal cord.[1]  (Tr. 329, 405, 619).  At that time, plaintiff had also been diagnosed with a history of chronic low back pain with chronic bilateral L5-S1 radiculopathy.  (Tr. 618).  An MRI confirmed a disc bulge compressing the nerve roots at the L5-S1 level, as well as a small disc bulge at the L4-5 level.  (*Id.*, Tr. 699).  On January 12, 2010, plaintiff presented to the Ohio State University Medical Center for an evaluation of pain.  Her symptoms included burning, numbness, and tingling of the arms and legs.  Her medications included Baclofen, Cymbalta, Lyrica, and Synthroid.  Plaintiff underwent quantitative sudomotor testing[2] that demonstrated reduced sweat volume production of the foot.  This study demonstrated a length dependent post-ganglionic dysfunction associated with small fiber neuropathy.  (Tr. 410).  In January 2010, Dr. Leon Margolin, M.D., Ph.D., plaintiff's Ohio State University Medical Center pain specialist, assessed a chronic complex pain syndrome secondary to more than one pain generator.  (Tr. 699-700).  Dr. Margolin diagnosed myofascial pain, which was evident on history and exam with multiple trigger points in the upper spine and bilateral trapezii; bilateral occipital neuralgia; fibromyalgia-like syndrome; degenerative disc disease of the lumber spine; sacroiliitis; bilateral cluneal neuralgia; left shoulder bicipital tendonitis; muscle spasms; and medical management.  (Tr. 700-01).  From January through September 2010, Dr. Margolin treated plaintiff with trigger point injections, caudal epidural steroid injections, right and left occipital nerved injections, and lumbar epidural

---

[1] "Myelopathy is an injury to the spinal cord due to severe compression that may result from trauma, congenital stenosis, degenerative disease or disc herniation."  *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (last visited on 8/12/2021).

[2] "The quantitative sudomotor axon reflex test (QSART, or sweat test) measures the nerves that control sweating. The test can help diagnose autonomic nervous system disorders, peripheral neuropathies and some types of pain disorders."  *See* https://my.clevelandclinic.org/health/diagnostics/16398-quantitative-sudomotor-axon-reflex-test-qsart (last visited on 8/21/2021).

steroid injections, and prescribed the medications Lyrica, methadone, and Baclofen. (Tr. 416, 432-33, 438, 443, 448, 452, 455, 465, 488, 491).

Plaintiff's primary care physician, Jacqueline Ward, M.D., has treated plaintiff since 2008. (Tr. 3400). Dr. Ward's notes from August and September 2010 show plaintiff was treated for chronic degenerative disc disease, myelopathy secondary to a spinal cord contusion, breast cancer, hypothyroidism, and hyperlipidemia. (Tr. 1542, 1545). In September 2010, Dr. Ward reported that plaintiff had "very slow improvement" in her neck pain from myelopathy. Dr. Ward noted that plaintiff was receiving epidural injections from Dr. Margolin for bilateral sciatica with a good response. However, plaintiff was unable to perform physical therapy exercises at full recommendation due to myelopathy. (Tr. 1541). Plaintiff was experiencing fatigue from hypothyroidism and her symptoms had gradually worsened. (Tr. 1541). Dr. Ward opined that plaintiff's myelopathy was "improving very slowly, but symptoms continue to be disabling and prevent patient from working." (Tr. 1543).

In October 2010, plaintiff was examined by Dr. Margolin. Plaintiff reported very good improvement with the previous interventions and that her pain was well-controlled on methadone, Lyrica, and Baclofen. She report pain of 2-3/10. On examination, plaintiff complained of shooting pain in the bilateral L5 and S1 distribution. Dr. Margolin assessed chronic complex pain syndrome secondary to more than one pain generator; generalized pain syndrome; occipital neuralgia; myofascial pain; HNP [herniated nucleus pulposus]; and degenerative disc disease of the lumber spine. (Tr. 424). Dr. Margolin increased plaintiff's dose of Lyrica, started Oxycontin with Percocet for breakthrough pain, and continued Baclofen. (Tr. 426).

Dr. Ward reported worsening symptoms of myelopathy in December 2010, likely because of withdrawal of Cymbalta due to abnormal liver function tests.  (Tr. 1520).  Plaintiff was to follow up with her pain specialist.  (*Id*.).  Dr. Ward reported in January 2011 that plaintiff's myelopathy likely triggered fibromyalgia-like myofascial pain syndrome with a recent exacerbation.  (Tr. 1511).  Plaintiff discussed her pain management options with Dr. Margolin and her medications were changed.  February 2011 notes show plaintiff had improved pain control with the switch from oxycodone to Opana.  (Tr. 1502).  In April 2011, Dr. Ward reported that plaintiff's symptoms of myelopathy had returned to baseline and plaintiff was to avoid any further physical therapy or new exercise program unless given consent by Dr. Margolin, her pain physician.  (Tr. 1477).

Dr. Ward's notes from September 2011 state that plaintiff saw Dr. Catherine Willner, a specialist in autonomic neurology, in Durango, Colorado.  Dr. Ward reported that "[a]fter extensive testing, [Dr. Willner] believes patient's symptoms are due to combination of spinal cord injury at C1 and exposure to adriamycin during breast cancer treatment.  Treatment plan is to perform laser treatments for small fiber neuropathy[3], selective nerve stimulation for C1 injury.  After 1 week of treatment, pain issues 30% better, now only needing Opana on prn basis.  Continues treatment at home 3x/week."  (Tr. 612).

In October 2011, plaintiff saw Dr. Willner, who had reviewed extensive medical records relating to plaintiff's various conditions and treatment.  Dr. Willner noted that she had previously seen plaintiff for "burning foot pain and findings suspicious for clinically present small fiber

---

[3] "Neuropathic pain is a complex, chronic pain state that usually is accompanied by tissue injury.  With neuropathic pain, the nerve fibers themselves may be damaged, dysfunctional, or injured.  These damaged nerve fibers send incorrect signals to other pain centers."  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 721 (6th Cir. 2014) (citing Neuropathic Pain Management, WebMD, www.webmd.com/pain-management/guide/neuropathic-pain (last visited Jan. 12, 2014)).

neuropathy related to exam findings and presentation."  (Tr. 351).  Dr. Willner assessed "chronic

pain, small fiber neuropathy" and "chronic lumbar degenerative disc disease with intermittent

presentation with L5 more than S1 radiculopathy."  (Tr. 352).  Dr. Willner reported that plaintiff:

> has objective evidence on examination and limited autonomic testing for presence
> of small fiber neuropathy which would easily explain lower extremity pain
> complaints and the objective vascular changes on examination.  That diagnosis
> could also explain diffuse burning pain reported as intermittently disabling and the
> extent to which that is treated with multiple medications, some of it may be partially
> controlled but requiring the use of many sedating medications that interfere with
> her ability to function. . . .  She has chronic pain related to lumbar degenerative
> disease. . . .  She has had extensive injection therapies with intermittent relief. . . .

(Tr. 352).

In June 2012, Dr. Ward reported that plaintiff had been treated at the Windom Medical

Center in Durango, Colorado for four months for myelopathy and had experienced

"[t]remendous improvement with re-booting of autonomic nervous system."  (Tr. 608).  At a

September 2012 office visit, Dr. Ward reported that a recent MRI showed cervical foraminal

stenosis from C4-7.  (Tr. 603).  Plaintiff was experiencing more radicular symptoms in both arms

with weakness on the left.  She was taking Opana and Valium with good results.  (Tr. 603).

In March 2013, Dr. Ward reported that myelopathy was largely resolved, but plaintiff

was still having pain issues related to radiculopathy at C5 and C7.  Plaintiff was working with a

physical therapist and taking Cymbalta, Lyrica, and Valium as needed.  Her pain level was 4-5

on average, and she was managed by Dr. Willner in Colorado.  Dr. Ward further reported that

plaintiff was still experiencing right leg pain due to degenerative disc disease.  Plaintiff was

regularly using a Flector patch, and she was to see Dr. Valentin, a physical medicine specialist at

Wellington Orthopaedics and Sports Medicine, for an epidural injection.  (Tr. 597, 599).

Dr. Valentin examined plaintiff on March 13, 2013.  (Tr. 508).  His progress notes state

that he last saw plaintiff in 2009.  As part of the March 2013 visit, he reviewed Dr. Willner's

9

records. He reported that plaintiff had a spinal cord and central cord type injury and aneurysm tear after cervical manipulation from a chiropractor. Dr. Valentin stated that plaintiff had also been diagnosed with small fiber neuropathy and dealing with both cervical and lumbar radicular symptoms. (*Id.*). At that time, plaintiff reported a long history of recovery, improved weakness, radiating pain in the posterior cut and posterior cast on the bottom of the feet, and upper extremity radiating pain. (*Id.*). Dr. Valentin assessed a history of cervical radiculopathy, post cervical chiropractic manipulation with bilateral radiculopathy and neck pain; radiographic stable C5-6 retrolisthesis, neutralized with flexion without evidence of ongoing myelopathy; mechanical back pain and lower extremity radiculopathy bilaterally with radiographic L5-S1 disc protrusion; small fiber neuropathymechanical back pain and lower extremity radiculopathy bilaterally with radiographic L5-S1 disc protrusion; and small fiber neuropathy. (Tr. 509). His plan was physical therapy without traction or cervical manipulation and an L5-S1 midline interlaminar epidural, which was performed on March 18, 2013. (Tr. 509, 950).

On April 1, 2013, Dr. Valentin saw plaintiff for a follow-up after her L5-S1 interlaminar epidural injection. (Tr. 510). Plaintiff had left lumbar improvement but still experienced right-sided symptoms that were bothersome with sitting. Dr. Valentin's impression was degeneration of lumbar or lumbosacral intervertebral disc; new cervical radiculopathy, post cervical chiropractic manipulation with bilateral radiculopathy and neck pain; stable C5-6 retrolisthesis without ongoing myelopathy; small fiber neuropathy; and mechanical back pain and lower extremity radiculopathy with radiographic L5-S1 disc protrusion. Dr. Valentin ordered a lumbar spine MRI and physical therapy. (Tr. 511). On April 10, 2013, Dr. Valentin reported that plaintiff was still experiencing radiating pain in the posterior thighs and calves into the feet, more S1 on the left and more L5 on the right, without progressive weakness. (Tr. 512). Dr. Valentin

10

reported that plaintiff's MRI showed a disc bulge at L5-S1 with central protrusion abutting the left S1 nerve root and touching the distal descending right S1 nerve root. At L4-5 there was a posterior midline annular tear and noncompressive protrusion, which was unchanged from plaintiff's April 11, 2011 MRI. (Tr. 513). The plan was for a bilateral L5-S1 transforaminal epidural to bring the radicular syndrome under control. (*Id.*).

In May 2013, plaintiff reported 50% benefit from the epidural and less frequent pain in her legs. However, she felt her back pain was more centralized and worse with sitting. (Tr. 514). The plan was for another L5-S1 transforaminal epidural to bring the radicular syndrome under control. (Tr. 515). In a follow-up exam on May 29, 2013, plaintiff reported overall improvement after the series of three epidurals, and her pain was well-controlled. (Tr. 516). Dr. Valentin's impression was displacement of the lumbar intervertebral disc without myelopathy; thoracic or lumbosacral neuritis or radiculitis, unspecified; cervical chiropractic manipulation with bilateral radiculopathy and neck pain; stable C5-6 retrolisthesis without ongoing myelopathy; small fiber neuropathy; and mechanical back pain and lower extremity radiculopathy with radiographic L5-S1 disc protrusion. Dr. Valentin ordered continued rehabilitation and stated he would like "to give her [a] 6 month break up possible prior to considering further lumbar epidural [injections]." (Tr. 517).

Plaintiff was examined by Dr. Ward in September 2013. Dr. Ward reported that plaintiff experienced an exacerbation of spasms and neuropathic pain from myelopathy and degenerative disc disease in her neck and lower back due to a change in her physical therapy routine. (Tr. 592, 594). She was to follow up with Dr. Valentin for additional epidural injections. (*Id.*).

On November 14, 2013, plaintiff was examined by Dr. Valentin for low back pain and radiculopathy down both legs. (Tr. 831). Plaintiff had participated in physical therapy for four

months and was overall improving.  However, she was experiencing shooting pain from the buttock posterior thighs and calves to the feet.  She also reported radicular pain in the upper arms and forearms.  On cervical examination, plaintiff exhibited paraspinal tenderness on palpation, and triceps, biceps, and brachioradialis reflexes were 1+ bilaterally.  (Tr. 832).  Dr. Valentin assessed cervical and radicular chronic neuropathic pain and a history of cervical spinal cord contusion/trauma without spinal cord injury.  (Tr. 833).  Dr. Valentin's plan was to add the medication Celebrex for neuropathic Cox 2 [Cyclooxygenase-2] affect; consider activity for central alpha agonist affect; and bilateral L5-S1 transforaminal epidurals, #4 between now and then to 2013.  (*Id*.).  Dr. Valentin discussed with plaintiff a spinal cord stimulator, but both agreed it would not be in her best interest.  (*Id*.).

Plaintiff was examined by Dr. Valentin on January 14, 2014.  (Tr. 1045).  The progress notes show plaintiff had "known L5-S1 HNP [herniated nucleus pulposus] with chronic bilateral lumbar radiculopathy."  (*Id*.).  Plaintiff had recent worsening bilateral symptoms in her legs "following right distal L5 and left distal S1."  (*Id*.).  Dr. Valentin assessed cervical and radicular chronic neuropathic pain; a history of cervical spinal cord contusion/trauma without spinal cord injury; and a history of breast cancer.  (Tr. 1046).  That same day, Dr. Valentin administered a bilateral L5-S1 transforaminal epidural injection for bilateral lumbar radiculopathy.  (Tr. 947).

Plaintiff received chiropractic treatment (Tr. 358-60, 621-633, 1199-1368) and participated in numerous sessions of physical therapy throughout the relevant time period (Tr. 959, 570, 1884-1890, 1891-1916, 519-20, 808, 813).  On January 9, 2014, about one week after plaintiff's insured status lapsed, Kristin Thomas, PT, wrote a letter to both Drs. Willner and Valentin:

> Maureen [plaintiff] had asked me to provide an update to you regarding her progress with PT. Overall, she is improved, although we are currently in the midst

of a flare up.  She has been attending PT since 4/13 with a long break in the summer due to vacation.  Our main issue is stability.  We are able to obtain neutral alignment in her SI/LB and neck in PT with relief, but her body is having difficulty keeping the alignment. Her strength is overall improving: Bilateral LE 4/5 ↦ 4+/5, bilateral UE 3+/5 ↦ 4+/5.  Her pain is ranging from a 4-9/10.  We had been progressing her strength and stability consistently, and this most recent flare up is causing her small fiber and radiculopathy to remain in a high amount of discomfort.  She is constantly tight at her L hip flexors, left ITB, and bilateral UT.  Our plan is to continue to advance her strength, flexibility and stability and allow for her to sit, sleep, and stand comfortably.

(Tr. 826).

On November 30, 2015, Ms. Thomas completed a medical source statement.  (Tr. 982-88).  Ms. Thomas reported she generally had seen plaintiff every 2 to 3 weeks since April 2013. (Tr. 982).  She stated that plaintiff had chronic pain/paresthesia described as nerve and muscular pain throughout the neck, thoracic and lumbar spines and into the right upper extremity, head, and right lower extremity.  (*Id.*).  She reported the pain was constant but would increase with sitting or standing too long, temperature or barometric pressure changes, or insidiously.  (*Id.*). Ms. Thomas reported symptoms of tenderness, crepitus, muscle spasm and weakness, chronic fatigue, sensory loss, impaired sleep, abnormal posture, atrophy, and reduced grip strength.  (*Id.*). Cervical range of motion was limited.  (*Id.*).  Ms. Thomas reported that plaintiff had constant headache pain associated with impairment of the cervical spine ranging from mild to severe at the occipital, temporal and frontal regions.  (Tr. 983).  Ms. Thomas also reported that plaintiff had reduced lumbar range of motion, positive supine and seated straight leg raising test, abnormal gait, sensory loss, tenderness, crepitus, impaired sleep, S1 joint dysfunction, lumbar malalignment, and muscle spasm, atrophy, and weakness.  (Tr. 983-84).  Ms. Thomas reported that plaintiff improved with treatment but the results were temporary.  (Tr. 984).  She reported that at times plaintiff needed to take extra medication for break-through pain, which caused her to become more drowsy and lethargic, and plaintiff often complained of gastrointestinal

13

complaints and drowsiness. (*Id.*). Ms. Thomas assessed functional limitations that would equate to the ability to do less than full-time sedentary work. (Tr. 984-86). She reported that factors which increase plaintiff's symptoms are any change from a normal equilibrium, including a temperature change, stress, new demands, and humidity. (Tr. 986).

### 2. Weight to the treating physicians (second assignment of error)

In her second assignment of error, plaintiff alleges the ALJ erred by failing to give the opinions of her treating physicians, Drs. Ward and Valentin, controlling weight and failing to give good reasons for affording their opinions "little" weight. (Doc. 16 at PAGEID 3720-24). Plaintiff alleges that the ALJ failed to adhere to the Court's prior decision in reweighing the medical evidence. In response, the Commissioner argues that the ALJ complied with the Court's remand order and the ALJ's decision declining to give controlling weight to the opinions of plaintiff's treating physicians was supported by substantial evidence. (Doc. 17).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.[4] Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not

---

[4] 20 C.F.R. § 404.1527, which sets out the treating physician rule, has been amended for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. This amendment does not apply to plaintiff's claims, which she filed in December 2013. (*See* Tr. 1950).

inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. §
404.1527(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If
a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the
following factors in determining what weight to give the opinion: the length of the treatment
relationship and the frequency of examination, the nature and extent of the treatment
relationship, supportability of the opinion, consistency of the opinion with the record as a whole,
and the specialization of the treating source. *Wilson*, 378 F.3d at 544. *See also Blakley*, 581
F.3d at 408 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4) ("Treating source medical
opinions [that are not accorded controlling weight] are still entitled to deference and must be
weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)).

In addition, an ALJ must "give good reasons in [the] notice of determination or decision
for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. §
404.1527(c)(2). The ALJ's reasons must be "supported by the evidence in the case record, and
must be sufficiently specific to make clear to any subsequent reviewers the weight the
adjudicator gave to the treating source's medical opinion and the reasons for that weight."
*Gayheart*, 710 F.3d at 376 (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). This
requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of
h[er] case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled,"
and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule."
*Wilson*, 378 F.3d at 544.

### A. Dr. Ward

Dr. Ward completed a "Peripheral Neuropathy Medical Source Statement/Arthritis
Medical Source Statement" in November 2015. (Tr. 962-65, 968-71). She indicated in

November 2015 that she had seen plaintiff three to four times yearly over five years.  (Tr. 962, 968).  Plaintiff's diagnoses were small fiber neuropathy, central pain syndrome, and lumbar/cervical degenerative disc disease with radiculopathy.  (Tr. 962).  Dr. Ward opined plaintiff's prognosis was poor.  (*Id*.).  Two diagnoses were listed on the arthritis questionnaire by code ("M46.92" and "M47.816"), and plaintiff's prognosis was described as "guarded."  (Tr. 968).  Plaintiff's neuropathy symptoms were pain, paresthesia, abnormal gait, deficiencies in joint proprioception, urinary incontinence, diarrhea, weakness, sensory loss, decreased deep tendon reflexes, chronic fatigue, cramping, burning calves and feet, and muscle atrophy.  (Tr. 962).  The pain/paresthesia was severe, constant, and located in plaintiff's arms, lower legs, feet, hands and face.  (*Id*.).  Symptoms included cervical and lumbar pain, restricted range of motion, fatigue, and severe muscle spasms.  (Tr. 968).  The pain was constant, with an average severity level of 7/10, located in the cervical and lumbar spines, and precipitated by bad weather, bending, standing, walking, and stress.  (*Id*.).  Objective signs were reduced range of motion of the cervical and lumbar spines at the SI (sacroiliac) joint, SI joint instability, myofascial trigger points, fibromyalgia tender points, sensory changes, reflex changes, impaired sleep, weight loss, abnormal posture, tenderness, crepitus of the neck, reduced grip strength, swelling of the neck and back, muscle spasm, weakness and atrophy, abnormal gait, and positive straight leg raising test.  (*Id*.).  Dr. Ward opined that plaintiff had psychological problems and limitations associated with her physical impairments, which were cognitive limitations, impaired attention and concentration, impaired short-term memory, reduced ability to attend to and persist in tasks, depression, social withdrawal and anxiety.  (Tr. 963).  Dr. Ward stated that depression and anxiety contribute to the severity of plaintiff's symptoms and functional limitations.  (Tr. 968-69).  She reported that plaintiff suffered from medication side effects including chronic fatigue,

16

drowsiness, dizziness, memory and concentration issues, blurred vision, depression, memory loss, nausea, diarrhea, constipation, and GERD (gastroesophageal reflux disease). (Tr. 963, 969).

Dr. Ward assessed the following functional limitations: Plaintiff can walk 1 to 4 city blocks without rest or severe pain, sit 15 to 20 minutes at one time before she must get up, stand 15 to 20 minutes before she must change positions, and sit and stand/walk less than 2 hours total each in an 8-hour workday; she must be able to shift positions at will from sitting, standing or walking, to walk every 20 minutes for 10 minutes, and to take hourly unscheduled breaks during a workday and lie down or sit quietly to rest for 10 minutes before returning to work; and she could rarely lift 10 pounds, never twist or climb ladders, and rarely stoop, crouch/squat, or climb stairs. (Tr. 963-64, 969-70). Dr. Ward indicated that plaintiff's ability to grasp, turn and twist objects, perform fine finger manipulations, and reach in front of her body and overhead were restricted and that she had limitations on use of the upper extremities due to pain/paresthesia, muscle weakness, limitation of motion, motor loss, swelling, sensory loss/numbness, and medication side effects. (Tr. 964, 971). She opined that plaintiff was likely to be off task at least 25% of the day due to her symptoms interfering with her attention and concentration, and she was incapable of even "low stress" work. (Tr. 965, 971). Dr. Ward also reported that temperature extremes exacerbate plaintiff's neuropathy and joint symptoms. (Tr. 971). Dr. Ward dated plaintiff's symptoms and limitations back to July 2009. (Tr. 965, 971).

In September 2019, Dr. Ward completed a "Cervical/Lumbar Spine Medical Source Statement." (Tr. 3400-05). Dr. Ward opined that plaintiff could sit or stand only twenty to thirty minutes at one time before she needed to get up; she could sit less than two hours and stand/walk about two hours total in an eight-hour workday; and she would need to "frequently" take

unscheduled thirty minutes breaks during a working day. (Tr. 3402-03). Dr. Ward opined that plaintiff could "occasionally" lift less than ten pounds, "rarely" lift ten pounds, and "never" lift twenty or fifty pounds; and she could "occasionally" twist, stoop, crouch/squat, and climb stairs but never climb ladders. (Tr. 3403). Dr. Ward indicated that plaintiff's ability to grasp, turn and twist objects, perform fine finger manipulations, and reach in front of her body and overhead were restricted. (Tr. 3404). She opined that plaintiff was likely to be off task at least 25% of the day, and plaintiff's impairments were likely to produce "good days" and "bad days." (*Id.*). Dr. Ward also opined that plaintiff would be absent from work more than four days per month, and temperature extremes, humidity, pressure, fumes/gases, wetness, and stress would exacerbate plaintiff's symptoms. (*Id.*). Dr. Ward dated plaintiff's symptoms and limitations to July 3, 2009. (Tr. 3405). Dr. Ward also completed a "Peripheral Neuropathy Medical Source Statement" in September 2019 in which she held the same opinions and limitations. (Tr. 3406-09).

A deposition of Dr. Ward was conducted on October 24, 2019. (Tr. 3529-80). Dr. Ward stated that she had been treating plaintiff for ten to fifteen years, and she coordinated plaintiff's care with various specialists, including Dr. Valentin, a physical medicine specialist, and Dr. Willner, a specialist in small fiber neuropathy. (Tr. 3535). Dr. Ward stated that plaintiff had also seen orthopedic specialists who determined that surgery would likely make the neuropathy worse. (Tr. 3535). Dr. Ward testified that the specialists to whom plaintiff had been referred had generally kept her apprised of their treatment with plaintiff and she was familiar with their examination findings. (Tr. 3535-37, 3539).

In discussing plaintiff's impairments, Dr. Ward stated that plaintiff's "most disabling" conditions are small fiber neuropathy and central pain syndrome. Dr. Ward specified, "even if we fixed every problem with her spine, which is where all of this probably originated, it's not

going to fix the neuropathy, that nerve damage is done." (Tr. 3540). While plaintiff may obtain transient improvement from treatment, "it isn't going to cure her. . . ." (Tr. 3540). Dr. Ward stated, "it's unpredictable. She can have good days. She can have bad days." (*Id*.).

Dr. Ward explained the relationship between plaintiff's diagnosis of myelopathy and central pain syndrome and small fiber neuropathy. (Tr. 3542). Dr. Ward stated that the myelopathy started when plaintiff sustained a "very significant injury to her cervical spine due to a high velocity adjudgment technique that was overly aggressive." (Tr. 3542-43). Plaintiff had significant sensory and motor deficits as a result, but her spinal cord inflammation "improved" with "very aggressive treatment from a variety of specialists." (Tr. 3543). Dr. Ward stated, however, that plaintiff was left with residual central pain syndrome and small fiber neuropathy as a result. (*Id*.; *see also* Tr. 3546-47). Dr. Ward also noted that plaintiff had received a significant amount of chemotherapy for her breast cancer, which may have contributed to plaintiff's neuropathy. (Tr. 3544). Dr. Ward explained that the cervical myelopathy progressed to small fiber neuropathy leading to plaintiff's central pain syndrome. (Tr. 3546). Dr. Ward stated that the small fiber neuropathy affects every system in the body, and the clinical evidence in plaintiff's case is consistent with that. Dr. Ward testified, "There isn't a system of her [plaintiff's] body that is not affected by [her diagnosis of small fiber neuropathy]." (Tr. 3547). Dr. Ward opined that while there is "treatment that can help," central pain syndrome is "generally not reversible in most cases" and she has never seen anyone cured of small fiber neuropathy or central pain syndrome. (*Id*.). Dr. Ward further explained that the pain distribution associated with plaintiff's small fiber neuropathy and central pain syndrome is more diffuse than that associated with fibromyalgia trigger points. (Tr. 3549).

Dr. Ward opined that plaintiff suffered from central pain syndrome and fiber neuropathy prior to December 31, 2013, the date plaintiff's insured status lapsed. (Tr. 3550-51). Dr. Ward also noted that plaintiff suffers from degenerative disc disease of the cervical and lumbar spines, which "is debilitating for her." (Tr. 3552). Dr. Ward stated that although plaintiff has made some progress since her diagnosis of myelopathy, when asked if plaintiff was capable of doing a job on a regular basis where plaintiff could alternate sit/stand throughout the day and lift up to ten pounds occasionally, Dr. Ward responded, "Absolutely not." (Tr. 3554). Dr. Ward explained that although plaintiff occasionally had good days, "it would have a very detrimental effect on her [plaintiff's] health and progress if she tried to do that." (Tr. 3554-55). Dr. Ward stated that plaintiff's improvement is in "her quality of life, but her functional capacity has not improved." (Tr. 3558-59). Dr. Ward explained that "when she [plaintiff] has a good day, she's able to do a little bit more. But it's completely unpredictable. It's completely inconsistent. And if she pushes herself too much, she will pay for it for days." (Tr. 3559).

Dr. Ward further explained that a person with a central pain syndrome can have a completely normal physical exam in terms of range of motion and muscle strength because the primary issue is a sensory problem. (Tr. 3560). She explained the disease process "is happening within her nerve fibers" (Tr. 3565), and "[t]here is objective data to show that she has profound sensory nerve dysfunction." (Tr. 3566). She also clarified that the term "stable" in medical parlance means that the patient's condition is no different than the last time the physician examined her; it means her condition is not getting any worse and not getting any better. (Tr. 3561).

Dr. Ward confirmed that the opinions set forth in her previous medical source statements remain the same with the onset date "long before" December 2013. (Tr. 3556). She also opined

20

that the opinions of Dr. Valentin and the physical therapist were reasonably consistent with her opinions and consistent with what she had observed prior to December 2013. (Tr. 3557-58).

### i. The ALJ improperly weighed Dr. Ward's opinions

In the prior Report and Recommendation, the undersigned found that the ALJ had improperly weighed the opinions of Dr. Ward by failing to provide evidentiary support for the finding that the opinions were inconsistent with the other medical evidence in the record. *Riopelle*, 2019 WL 336902, at *12-13. The undersigned found that the ALJ failed to identify what specific evidence was inconsistent with the treating physician's opinions. *Id*. Specifically, the undersigned stated: "[i]t is not clear why the ALJ rejected both the treating physicians' [Drs. Ward and Valentin] assessments and that of the physical therapist as inconsistent with the other substantial evidence in the record given that the assessments of all three sources appear to be substantially similar in most material aspects." *Id*. at *12. The undersigned also found that the ALJ failed to explain why the timing of the assessment, i.e., the fact that the assessment was completed, and the opinion rendered, after the plaintiff's date last insured, "detracted from its presumptive weight." *Id*. at *13. Finally, the undersigned found that the ALJ failed to discuss and consider the additional regulatory factors, such as the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, and the supportability of the opinion. *Id*.

On remand, the ALJ declined to give controlling weight to Dr. Ward's opinions and instead gave them little weight. (Tr. 1959-61). After reciting the treating physician rule, the ALJ acknowledged that Dr. Ward had seen plaintiff since 2008 either quarterly or semi-annually and that Dr. Ward's opinions are related to her area of specialization. (*Id*.). The ALJ found that Dr. Ward's opinions are "not supported by the medical evidence. Dr. Ward's opinions are not

entitled to controlling weight because they are neither well supported nor consistent with the substantial evidence of record, as described further below." (Tr. 1959; *see also* Tr. 1960). The ALJ cited four reasons for discounting Dr. Ward's opinions: (1) plaintiff's condition improved over time; (2) Dr. Ward's opinions are internally inconsistent with her own records; (3) Dr. Ward imposed significant limitations while plaintiff's treatment remained essentially routine and conservative in nature; and (4) Dr. Ward's 2015 and 2019 opinions were made well after the date last insured. (Tr. 1960-61).

The ALJ's reasons for giving Dr. Ward's opinions little weight are not supported by substantial evidence. First, the ALJ erred in discounting Dr. Ward's opinions on the basis that the medical evidence of record showed that plaintiff was "was 'getting improvement' from epidural injections and therapy (5F/9, 34F/61, 42F/29, *for example*)." (Tr. 1961). The ALJ stated, "Among other things, while the record reflects some significant symptomology immediately after her alleged onset date, with treatment, the claimant's condition improved." (Tr. 1961).

Improvement, however, is dependent on the base level from which the improvement is measured:

> Even if [a doctor's] use of the word "better" referred to Plaintiff's mood, this word did not provide the ALJ with substantial evidence from which to find that Plaintiff's mental impairment had subsided. The ALJ made no inquiry into the degree of improvement, or from what baseline Plaintiff had improved. Under the ALJ's logic, any improvement in one's mood, regardless of how small and from what level the individual improved, would defeat a claim of mental impairment. This cannot be so.

*Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011).

The ALJ here applied the reasoning rejected in *Boulis-Gasche*. The ALJ discounted Dr. Ward's opinions based on plaintiff's supposed improvement from epidural injections and

therapy.  However, the ALJ did not cite any findings or evidence to show the baseline from which plaintiff's condition had improved or the degree of improvement such that plaintiff could engage in substantial gainful activity on a sustained basis and Dr. Ward's opinions were not substantially supported.

Further, two out of the three medical records of "improvement" cited by the ALJ are dated before plaintiff's alleged disability onset date of July 3, 2009 and, therefore, are of limited relevance to whether Dr. Ward's opinions are inconsistent with the other substantial evidence in the record for the relevant time period.  *See* 20 C.F.R. § 404.1527(c)(2).

In any event, aside from the ALJ's brief reference to records showing "improvement," the record as a whole shows that the improvement plaintiff experienced was time-limited.  The two records from March 2009 cited by the ALJ relate to improvement from a single epidural injection.  (Tr. 1107 [Ex. 34F/61], Tr. 1643 [Ex. 42F/29]).  On March 31, 2009, Dr. Valentin reported that plaintiff's March 13, 2009 epidural injection resulted in fifty percent relief of plaintiff's discomfort in her right medial groin in her thigh.  (Tr. 1643).  However, Dr. Valentin reported that plaintiff was having more pronounced discomfort on her right knee and medial right buttock.  (*Id*.).  The only other record cited by the ALJ in support of her decision to discount Dr. Ward's opinion is a May 29, 2013 treatment note from Dr. Valentin.  (Tr. 516).  On that date, Dr. Valentin reported that plaintiff was "[o]verall a lot better improved after a series of 3 recent injections."  (Tr. 517).  The ALJ's depiction of the evidence as showing plaintiff's condition had "improved" or was "improving" is not substantially supported by the record.

The record reflects that treatment, such as epidural injections, may have helped in the short term.  However, the treatment notes and medical evidence of record are not indicative of overall improvement when examined as a whole.  It is improper to use evidence of "periodic

23

improvements" to discount the severity of an impairment when it is based on a selective review

of the record.  *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014) (citing

*Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *Germany–Johnson v.

Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008)).  The ALJ's limited citations to

records showing improvement is not a good reason for discounting Dr. Ward's opinions because

they fail to account for the short term relief plaintiff experienced and the waxing and waning of

pain associated with her multiple medical conditions and chronic pain syndrome.  *See, e.g.*, Tr.

1543 ("improving very slowly, but symptoms continue to be disabling"); Tr. 426 (despite very

good improvement with interventions prior to October 2010, still had shooting pain in bilateral

L5 and S1 distribution; Dr. Margolin increased pain medication, started opioids for breakthrough

pain, continued other medications); Tr. 1520 (worsening symptoms); Tr. 1511 (recent

exacerbation of myofascial pain triggered by myelopathy); Tr. 352 (plaintiff has had "extensive

injection therapies with intermittent relief"); Tr. 597, 512, 599 (still experiencing right leg pain,

radiating pain in thighs and calves into feet); Tr. 514 (50% improvement and less frequent pain

in legs, but back pain more centralized and worse with sitting); Tr. 592, 594 (exacerbation of

spasms and neuropathic pain); Tr. 1199 (persistent neck, back, shoulder, knee, and foot pain).

Indeed, in November 2013, after the series of three epidural injections cited by the ALJ, plaintiff

presented to Dr. Valentin with "low back pain" and "radiculopathy pain is running down both

legs."  (Tr. 831).  Dr. Valentin reported that plaintiff was "[o]verall improving but shooting pain

from buttock posterior thighs and calves to the feet.  Also some radicular pain she describes

posterior lateral upper arms lateral forearms.  There is no progressive weakness."  (*Id*.).  Dr.

Valentin prescribed Celebrex for neuropathic Cox 2 affect; "activity for central alpha agonist

affect"; and "bilateral L5-S1 transforaminal epidurals, #4 between now and then to 2013."  (Tr.

833).  Dr. Valentin discussed with plaintiff "spinal cord stimulator" but "both agree[d] [it] would not be in her best interest."  (*Id*.).  Plaintiff's follow-up appointment with Dr. Valentin on January 14, 2014, just fourteen days after the date last insured, also demonstrates that plaintiff's pain continued to persist despite receiving three epidural injections.  (Tr. 1045).  On that day, Dr. Valentin reported, "Recent worsening bilateral symptoms in legs following right distal L5 and left distal S1.  No new weakness.  No b/b changes."  (*Id*.).  Dr. Willner noted, "small pain neuropathy is difficult to control" and "radicular pain can wax and wane."  (Tr. 798).  Physical therapist Thomas reported that plaintiff improved with treatment but the results were temporary.  (Tr. 984).  Dr. Ward stated that plaintiff obtained transient improvement with treatment and experienced "good" and "bad" days.  (Tr. 3540).  Plaintiff's medical providers consistently opined that the relief plaintiff received from treatment was temporary.

Despite the improvement noted by the ALJ, the record as a whole demonstrates that plaintiff's symptomology and pain associated with her multiple impairments consistently returned to pre-treatment levels despite receiving epidural injections.  Therefore, the ALJ's reliance on plaintiff's "improvement" from epidural injections and therapy as a basis for discounting Dr. Ward's opinions is not supported by substantial evidence.

Second, the ALJ erred in giving Dr. Ward's opinions little weight on the basis that her opinions were "internally inconsistent."  (Tr. 1961).  The ALJ stated, "For example, records from March 2013 show that the claimant's myelopathy was 'largely resolved,' which is not consistent with her 2019 opinion that the claimant could rarely lift and carry 10 pounds, could occasionally climb stairs, and could never climb ladders (56F/8)."  (*Id*.).  The ALJ's citation to Dr. Ward's March 14, 2013 treatment note is incomplete and fails to account for the neuropathic pain syndrome which developed after the myelopathy resolved.

On March 14, 2013, Dr. Ward reported that plaintiff's myelopathy was "largely resolved." However, the ALJ omitted the balance of Dr. Ward's note that plaintiff was still experiencing "residual pain issues." (Tr. 600). Dr. Ward explained that plaintiff was "still having pain issues related to radiculopathy at C5 and C7," which could reasonably explain the limitations opined by Dr. Ward despite the "largely resolved" myelopathy. (Tr. 599). Dr. Ward noted that plaintiff was attending physical therapy and taking Cymbalta, Lyrica, and Valium as needed, and her pain level was 4-5/10 on average. (*Id*.). Dr. Ward further noted that Dr. Willner, plaintiff's small fiber neuropathy specialist, was managing this condition. (*Id*.).

More importantly, the ALJ ignored the impact of plaintiff's small fiber neuropathy that resulted from the myelopathy. As Dr. Ward explained in her deposition, plaintiff suffered significant sensory and motor deficits as a result of myelopathy and showed improvement with "very aggressive treatment from a variety of specialists[.]" (Tr. 3543). However, as a result of the myelopathy, plaintiff developed a residual central pain syndrome and small fiber neuropathy, which affects every system in the body. (*Id*.; *see also* Tr. 3546-47). Dr. Ward explained that the cervical myelopathy progressed to small fiber neuropathy leading to plaintiff's central pain syndrome. (Tr. 3546). This resulted in a nerve fiber disease process and pain syndrome that is more diffuse than that associated with fibromyalgia. (*Id*., Tr. 3565). Dr. Ward stated that the objective data supported plaintiff's "profound sensory nerve dysfunction." (Tr. 3566). As a result, patients with a central pain syndrome can have a completely normal physical exam in terms of range of motion and muscle strength because the primary issue is a sensory problem. (Tr. 3560). Therefore, while plaintiff's myelopathy may have largely resolved, the ALJ failed to account for the small fiber neuropathy and central pain syndrome that developed as a result of the myelopathy, which supports Dr. Ward's opinion on lifting and other restrictions. The ALJ's

stated basis for discounting Dr. Ward's opinion – that plaintiff's myelopathy was "largely resolved" – is not a "good reason" under the Social Security regulations and controlling law.

Third, the ALJ also gave little weight to Dr. Ward's opinion because "Dr. Ward's treatment remained essentially routine and conservative in nature." (Tr. 1961). In assessing the weight to give a treating source opinion, the ALJ may appropriately consider the type of treatment the source has provided. 20 C.F.R. § 404.1527(c)(2)(ii). However, the ALJ must also consider "the kinds and extent of examinations and testing the source has performed *or ordered from specialists* and independent laboratories." *Id*. (emphasis added). Here, Dr. Ward coordinated plaintiff's care with her various specialists, including Drs. Margolin, Willner, and Valentin. (Tr. 3535). These physicians kept Dr. Ward apprised of their treatment of plaintiff and her responses to such treatment. (Tr. 3535-37, 3539). Thus, the fact that Dr. Ward herself administered treatment that was "routine" or "conservative" in nature ignores Dr. Ward's role as the gatekeeper of plaintiff's treatment with her other specialists. Moreover, no physician has suggested that surgery or other more invasive treatment modalities were appropriate to treat plaintiff's small fiber neuropathy and other multiple conditions. The conservative nature of Dr. Ward's treatment is not a "good reason" to discount her opinions.

Finally, the ALJ erred in giving Dr. Ward's opinions little weight on the basis that the opinions were made after plaintiff's insured had lapsed on December 31, 2013. Specifically, the ALJ gave the 2019 deposition opinion of Dr. Ward little weight "in part due to the fact that the opinion was made almost six years after the date last insured[.]" (Tr. 1960). Although post-insured status evidence of new developments in a claimant's condition is generally not relevant, *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981), such evidence may be examined, however, when it establishes that the impairment existed continuously and in the same degree from the date

plaintiff's insured status terminated.  *See Johnson v. Sec'y of H.E.W.*, 679 F.2d 605 (6th Cir.

1982).  To the extent that evidence subsequent to the date last insured is relevant, it "'must relate

back to the claimant's condition prior to the expiration of [the] date last insured.'"  *Thomas v.*

*Comm'r of Soc. Sec.*, No. 2:18-cv-108, 2019 WL 2414675, at *3 (S.D. Ohio June 7, 2019)

(quoting *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003)).  *See also King v.*

*Sec'y of HHS*, 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration evidence may be

considered, but it must relate back to plaintiff's condition prior to the expiration of the date last

insured).  As explained by the undersigned in the prior Report and Recommendation, "[t]he ALJ

did not explain why the timing of the assessment detracted from its presumptive weight."

*Riopelle*, 2019 WL 336902, at *13.  The ALJ committed the same error on remand by not

explaining *why* the timing of Dr. Ward's opinion in 2019, i.e., that it occurred six years after the

date last insured, detracted from its presumptive weight.  The ALJ's stated reason is not a "good

reason" for giving Dr. Ward's opinion only limited weight.

### B.  Dr. Valentin

Dr. Valentin completed a medical source statement in November 2018.  (Tr. 974-80).  He

reported he had seen plaintiff approximately every 6 months over a 4 to 5 year period.  (Tr. 974).

He diagnosed general pain syndrome, cervical/lumbar radiculopathy, and degenerative disc

disease.  (*Id.*).  He opined that plaintiff's prognosis was poor.  (*Id.*).  He reported that plaintiff

had chronic pain/paresthesia in the neck, back, arms and legs that was constant and was

aggravated by stress, temperature changes, light touch and movement.  (*Id.*).  He identified her

symptoms as tenderness, crepitus, muscle spasm and weakness, chronic fatigue, weight change,

sensory loss, impaired sleep, swelling, atrophy and reduced grip strength.  (*Id.*).  Dr. Valentin

reported that plaintiff had reduced cervical range of motion.  (*Id.*).  He also reported that plaintiff

28

had severe and constant headache pain that was associated with impairment of the cervical spine; the pain level was 7/10; the symptoms associated with the headaches were nausea/vomiting, photosensitivity, impaired sleep, and exhaustion; and lying down, taking medication, being in a quiet place, massage, acupuncture, and physical therapy improved plaintiff's headache pain. (Tr. 975). He reported that objective signs of lumbar impairment were reduced range of motion, positive supine and seated straight leg raising test, muscle spasm and weakness, tenderness and impaired sleep. (Tr. 975-76). Side effects from her treatments included fatigue, decreased memory, poor concentration, and reflux. (Tr. 976). Dr. Valentin opined that depression and anxiety contributed to the severity of plaintiff's symptoms and functional limitations. (*Id*.).

Dr. Valentin assessed plaintiff as able to walk 1 to 3 city blocks without rest or severe pain; sit 15 minutes at one time before she must get up; stand 15 minutes before she must change position; and sit and stand/walk less than 2 hours each in an 8-hour workday. (*Id*.). She would need to be able to shift positions at will from sitting, standing or walking; to walk every 15 minutes for 5 to 10 minutes; and to take unscheduled breaks about every 30 minutes during a workday and lie down for 15 minutes before returning to work. (Tr. 977). She could occasionally lift 10 pounds, look down only rarely, turn her head right or left occasionally, and hold her head in a static position frequently. (*Id*.). She could occasionally twist, rarely stoop and crouch/squat, and never climb ladders/stairs. (*Id*.). Dr. Valentin opined that plaintiff was likely to be off task 25% or more of the workday due to her symptoms interfering with her attention and concentration. (Tr. 978). He opined that plaintiff was capable of only "low stress" work because stress increases her pain. (*Id*.). He further opined that plaintiff's impairments were likely to produce good days and bad days and she was likely to be absent from work more than four days per month. (*Id*.). Dr. Valentin reported that temperature extremes and stress

exacerbate plaintiff's neuropathy and joint symptoms.  (*Id*.).  Dr. Valentin also included the

following narrative comments:

> Confirmed diagnosis of Central Pain Syndrome (CPS). . . .  The patient's symptoms
> are consistent with the diagnosis[.]
>
> I have known this patient for several years and [have] seen her work extremely hard
> to get well[.]
>
> The chronic and intractable pain and CPS symptoms resulting from the chiropractic
> maladjustment and spinal cord injury have led to serious and sustained
> depression[.]
>
> Symptoms are variable and unpredictable and can range anywhere from 5-10 on
> the pain scale and last anywhere from 15 minutes to several hours on any given
> day[.]
>
> Stress causes a major spike in the debilitating pain the patient experiences
> constantly[.]

(Tr. 980).  Dr. Valentin dated plaintiff's symptoms and limitations back to July 2009.

(Tr. 979).

In October 2019, Dr. Valentin completed a "Cervical/Lumbar Spine Medical Source

Statement" stating that he had seen plaintiff every six months for eight to nine years.  (Tr. 3521-

26).  Dr. Valentin listed plaintiff's diagnoses as central pain syndrome, degenerative disc disease

(cervical and lumbar), and cervical and lumbar radiculopathy and her prognosis as poor.  (Tr.

3521).  Dr. Valentin stated that plaintiff had chronic pain/paresthesia in her neck, back, arms and

legs (constant) that was aggravated with stress, temperature changes, and physical activity.  (*Id*.).

Dr. Valentin opined that plaintiff had cervical limitation of motion (*Id*.) and reduced lumbar

range of motion.  (Tr. 3522).  Dr. Valentin also opined that plaintiff could sit or stand only

twenty to thirty minutes at one time before she needed to get up; she could sit less than, or about,

two hours and stand/walk about two hours total in an eight-hour workday; and she would need to

take unscheduled breaks, which depended on the severity of her pain, during a working day.  (Tr.

3523-24). Dr. Valentin explained that plaintiff would need to lie down and use heat wraps, ice packs, and Kinesiota on such a break. (Tr. 3524). Dr. Valentin opined that plaintiff could "rarely" and/or "occasionally" lift less than ten pounds and "never" lift twenty or fifty pounds; she was likely to be off task at least 25% of the day; and plaintiff's impairments were likely to produce "good days" and "bad days." (Tr. 3524-25). Dr. Ward opined that plaintiff would be absent from work more than four days per month and temperature extremes, humidity and biometric changes, fumes, gases, wetness, and stress would increase plaintiff's pain. (*Id*.).

### i. The ALJ improperly weighed Dr. Valentin's opinions

In the prior Report and Recommendation, the undersigned found that the ALJ had improperly weighed the opinions of Dr. Valentin, in part, by failing to provide evidentiary support for the finding that the opinions were inconsistent with the other medical evidence in the record. *Riopelle*, 2019 WL 336902, at *12-13. On remand, the ALJ declined to give controlling weight to Dr. Valentin's opinions, instead giving them little weight. (Tr. 1961-62). The ALJ acknowledged that Dr. Valentin had seen plaintiff every six months for the last eight to nine years and that his examinations and assessments were consistent with his specialty. (Tr. 1961). The ALJ, however, found that Dr. Valentin's opinions were "not consistent with the medical evidence as a whole." (*Id*.). In support of this finding, the ALJ stated:

> [Dr. Valentin] noted that the claimant had constant pain and a limitation in motion, but this statement does not necessarily reflect the claimant's condition during the relevant period. He noted just before the alleged onset date that the claimant was doing well and symptoms were unchanged (42F/23). Imaging revealed only mild findings, and March 2013 records show that the claimant reported a long history of recovery and that weakness was improved (5F/1, 22F/4, 42F/42, *for example*).

(Tr. 1961-62).

The ALJ's reasons for giving Dr. Valentin's opinions little weight are not supported by substantial evidence. First, to the extent the ALJ questioned Dr. Valentin's notation of constant

pain and limitation of motion, the evidence cited by the ALJ in support, by her own admission, is prior to the alleged onset date. (Tr. 1961, citing Tr. 1637). The Court is unable to discern how the evidence of plaintiff's condition *prior to* her alleged onset is relevant to the time period after the alleged onset date of disability, which is tied to the chiropractic treatment on July 3, 2009, which resulted in a spinal cord injury and myelopathy. This is not a "good reason" to discount Dr. Valentin's opinion.

Second, to the extent the ALJ may be alleging that Dr. Valentin's opinions were not entitled to significant weight because they were written after plaintiff's date last insured, the ALJ did not explain why the timing of Dr. Valentin's assessments detracted from their presumptive weight.

Third, the ALJ interpreted the May 2009 and August 2009 MRI findings as "only mild." (Tr. 1961, citing Tr. 511, 1656). In contrast, Dr. Valentin interpreted the May 2009 MRI as showing a disk protrusion at L5-S1 abutting the bilateral S1 nerve roots, and he assessed "symptomatic L5-S1 HNP [herniated nucleus pulposus] with right sciatica." (Tr. 848; *see* Tr. 924). Dr. Valentin ordered another MRI in April 2013 (Tr. 1146), which showed "a bulge at L5-S1 with central protrusion abutting left S1 nerve root and touching the distal descending right S1 nerve root." (Tr. 513). Dr. Valentin reported that at L4-5 "there is a posterior midline annular tear and noncompressive protrusion, unchanged from 04/11/2011 MRI." (*Id.*). Based on this MRI, Dr. Valentin determined that a bilateral L5-S1 transforaminal epidural was needed "to bring the radicular syndrome under control." (*Id.*). The ALJ failed to discuss Dr. Valentin's interpretations of the MRI evidence and his medical conclusions. Moreover, the ALJ failed to cite to any medical evidence interpreting the MRI findings as "only mild," and her interpretation stands in contrast with the medically trained treating specialist. The ALJ is not qualified to

32

interpret raw medical data in the MRI reports. *See Mitsoff v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 693, 703 (S.D. Ohio 2013) (and cases cited therein). The ALJ's rejection of Dr. Valentin's opinions on this basis is not supported by substantial evidence.

Finally, the ALJ cited a March 13, 2013 treatment note from Dr. Valentin for the proposition that plaintiff "reported a long history of recovery and that weakness was improved." (Tr. 1961, citing Ex. 5F/1 [Tr. 508]). The ALJ failed to provide any explanation or discussion as to why this treatment note was inconsistent with Dr. Valentin's opinions. Indeed, this same treatment note shows that plaintiff's pain persisted: "The records have shown flexion and extension with mild retrolisthesis of C4 and C5. She currently describes radiating pain the posterior cut and posterior cast the bottom of the feet. She also has upper extremity radiating pain." (Tr. 508). Additionally, the final treatment note from Dr. Valentin prior to the date last insured shows that plaintiff was "[o]verall improving but" continued to suffer from "shooting pain from buttock posterior thighs and calves to the feet. Also some radicular pain she describes posterior lateral upper arms lateral forearms." (Tr. 831). Contrary to the ALJ's decision, the medical evidence of record is consistent with, and supports, Dr. Valentin's opinions. *See Deaton v. Comm'r of Soc. Sec.*, No. 1:16-cv-947, 2017 WL 6206196, at *12 (S.D. Ohio Dec. 7, 2017), *report and recommendation adopted*, 2018 WL 333857 (S.D. Ohio Jan. 8, 2018).

Thus, the ALJ did not comply with the obligations under 20 C.F.R. § 404.1527(c) in applying the controlling weight standard. The ALJ's conclusion that Dr. Valentin's opinion was inconsistent with the other evidence of record is not substantially supported. Further, the ALJ did not give "good reasons" for assigning Dr. Valentin's opinions "little weight." (Tr. 1961).

The ALJ's rejection of both the treating physicians' assessments is not supported by substantial evidence given the record as a whole. Their assessments are substantially similar in

most material respects and consistent with the functional assessment completed by plaintiff's

physical therapist, Ms. Thomas.  Although the ALJ was not bound by the treating physicians'

opinions, the ALJ was obligated to articulate "good reasons" based on the evidence of record for

not giving weight to such opinions.  *Wilson*, 378 F.3d at 544.  The ALJ failed to do so in this

case on remand.  Accordingly, the ALJ's decision is not supported by substantial evidence and

plaintiff's second assignment of error is sustained.

### 2.  The ALJ's assessment of plaintiff's subjective complaints (third assignment of error)

In her third assignment of error, plaintiff alleges that the ALJ's assessment of plaintiff's

subjective complaints of pain and physical limitations is not supported by substantial evidence.

(Doc. 16 at PAGEID 3724-26).  The Commissioner generally alleges in response that the ALJ

committed no error and was not required to rely on plaintiff's subjective allegations.  (Doc. 17 at

PAGEID 3744-47).

Title 20 C.F.R. § 404.1529 and Social Security Ruling 16-3p, 2016 WL 1119029, *3

(March 16, 2016) describe a two-part process for evaluating an individual's subjective statements

about symptoms, including pain.[5]  First, the ALJ must determine whether a claimant has a

medically determinable physical or mental impairment that can reasonably be expected to

produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and

functional limitations of those symptoms by considering objective medical evidence and other

evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of

pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage,

---

[5] SSR 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms," superseded SSR 96-7p and became applicable to decisions issued on or after March 28, 2016.  *See* SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (clarifying applicable date of SSR 16-3p).

effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5)

treatment, other than medication, received for relief of pain or other symptoms; (6) any measures

used to relieve pain or other symptoms; and (7) other factors concerning functional limitations

and restrictions due to pain or other symptoms. *See also* 20 C.F.R. § 404.1529(c)(3). The ALJ's

assessment of a claimant's subjective complaints and limitations must be supported by

substantial evidence and be based on a consideration of the entire record. *Rogers*, 486 F.3d at

247 (internal quotation omitted). The ALJ's explanation of her decision "must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248.

The ALJ found that plaintiff's medically determinable impairments could reasonably be

expected to cause her alleged symptoms, but plaintiff's statements concerning the intensity,

persistence, and limiting effects of her symptoms were not entirely consistent with the medical

and other evidence in the record. (Tr. 1955-56; *see also* Tr. 1959). The ALJ cited three primary

reasons for finding that the extent of plaintiff's alleged limitations was not supported by the

evidence in the record. (Tr. 1959). First, the ALJ found that "the medical evidence showed

conservative treatment and generally mild to benign findings on imaging." (*Id.*). Second, the

ALJ found that "medical evidence indicated she was doing better with medications and

injections." (*Id.*). Third, the ALJ found that plaintiff had "normal gait, coordination, and

physical exams throughout the relevant period, all of which indicate[d] that her impairments

[were] not as debilitating as she alleged." (*Id.*). The ALJ's assessment of plaintiff's subjective

complaints and limitations is not supported by substantial evidence.

As discussed above, the ALJ was not qualified to interpret the MRI findings as "mild" or

"benign." Likewise, the ALJ's reliance on plaintiff's conservative treatment in assessing

plaintiff's subjective complaints fails to account for the nature of plaintiff's small fiber neuropathy and chronic pain syndrome, which are not amenable to surgical or more aggressive treatment. *See* Tr. 3535; Tr. 833. Indeed, it is hard to imagine what other treatment modalities plaintiff should have sought out during the relevant time period given her persistent efforts to relieve her pain and other symptoms since July 3, 2009 without success. Drs. Margolin, Ward, Valentin, and Willner prescribed numerous medications (Gabapentin, Percocet, methadone, Lyrica, Baclofen, Dilaudid, Oxycontin, Percocet, Cymbalta, Opana, Wellbutrin XL, Valium, Flector patch, and Celebrex), which were adjusted on a regular basis, in an attempt to relieve plaintiff's pain. Plaintiff was administered epidural injections (Tr. 491, 452, 448, 443, 488, 416, 950, 949, 948, 947), occipital nerve injections (Tr. 452, 448, 443, 438), and trigger point injections (Tr. 455, 452, 448, 443, 438, 432-33, 465); participated in extensive physical therapy (Tr. 959, 570, 1884-1890, 1891-1916, 519-20, 808, 813); and received chiropractic treatment (Tr. 358-60, 621-633, 1199-1368) and specialized therapy (Tr. 1519 [hyperbaric oxygen treatments], Tr. 612 [laser treatments and selective nerve stimulation for neurological impairments]).

In addition, the ALJ erred by concluding that plaintiff's "normal gait, coordination, and physical exams throughout the relevant period . . . indicate[d] that her impairments [were] not as debilitating as she alleged." (Tr. 1959). Essentially, the ALJ found there were few objective findings to support plaintiff's subjective allegations of significant limitations. (*Id.*). It was not proper, however, for the ALJ to rely on normal physical examination findings to discount plaintiff's subjective allegations of pain and debilitating limitations because of the nature of her small fiber neuropathy, central pain syndrome, and fibromyalgia impairments. As Dr. Ward explained, a person with a central pain syndrome can have a completely normal physical exam in

terms of range of motion and muscle strength because the primary issue is a sensory problem

(Tr. 3560) and the disease process "is happening within her nerve fibers." (Tr. 3565). "One of

the hallmarks of a pure small fiber neuropathy is a normal or near normal physical and

neurologic examination. The coordination, motor, and reflex examination will be normal. Light

touch, vibratory sensation, and proprioception also may be normal, resulting in diagnostic

confusion in some situations." *Ali v. Colvin*, No. 3:15-cv-00632, 2016 WL 1670965, at *5 (D.

Or. Apr. 27, 2016) (quoting Alexandra Hovaguimian & Christopher Gibbons, Diagnosis and

Treatment of Pain in Small Fiber Neuropathy, http://www.ncbi.nlm.nih.gov/pmc/articles/

PMC3086960). *See also Cosby v. Berryhill*, No. 16 C 11504, 2017 WL 4237048, at *3 (N.D. Ill.

Sept. 25, 2017) (citing Jinny Tavee, Md, Lan Zhou, Md, Small Fiber Neuropathy: A Burning

Problem, Cleveland Clinic Journal of Medicine (May 2009)) (finding ALJ erred when he

characterized effects of small fiber neuropathy as mild because plaintiff had full strength and

range of motion of her upper and lower extremities because strength is not affected by small

fiber neuropathy). Moreover, "[s]mall fiber neuropathy, like fibromyalgia, is not typically

diagnosed via objective tests." *Rachel T. v. Comm'r of Soc. Sec.*, No. 4:20-cv-12, 2021 WL

3609307, at *9-10 (W.D. Va. Aug. 12, 2021). *See also Rogers*, 486 F.3d at 243 ("unlike medical

conditions that can be confirmed by objective testing, fibromyalgia patients present no

objectively alarming signs"); *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th

Cir. 1988) (noting that objective tests are of little relevance in determining the existence or

severity of fibromyalgia). Thus, the ALJ erred in discounting plaintiff's credibility by focusing

on the lack of objective evidence in the record, i.e., normal gait, coordination, and physical

exams, as evidence that plaintiff's "impairments [were] not as debilitating as she alleged[.]" (Tr.

1959).

Finally, as outlined earlier in this decision, the ALJ erred in the conclusions she drew from plaintiff's short-term improvement following therapy and epidural injections.  Accordingly, the ALJ erred when she determined that plaintiff's symptoms were not as severe as alleged because they were inconsistent with the objective evidence in the record.  Plaintiff's third assignment of error is sustained.

### 3.  The ALJ's RFC and vocational findings (first and fourth assignments of error)

Plaintiff alleges the ALJ failed to properly assess plaintiff's RFC and to take into account plaintiff's impairments, and the opinions of her treating physicians, when assessing plaintiff vocationally.  In light of the Court's rulings that the ALJ's assessments of the treating physicians' opinions and plaintiff's subjective symptoms are not supported by substantial evidence, the ALJ's assessments of plaintiff's RFC and vocational abilities are likewise not supported by substantial evidence because both are dependent upon a proper assessment of the treating physicians' opinions and plaintiff's subjective complaints.  Therefore, plaintiff's first and fourth assignment of errors are sustained.

## III.  This matter is reversed and remanded for an award of benefits

In a case such as this, where the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted.  Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted).  The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.  *Id*.

(citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)); *see also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).

Here, proof of disability as of July 3, 2009, plaintiff's alleged onset date, is overwhelming and the evidence to the contrary is lacking in substance. The instant record is fully developed and supports Dr. Ward's and Dr. Valentin's opinions of debilitating limitations as of the alleged onset date. In addition, the VE testified that if plaintiff had to leave work consistently two to three times per month for physical therapy or medical appointments, those absences would exceed the acceptable threshold for sustained employment. (Tr. 3616-17). Likewise, the VE testified that if plaintiff was limited to the standing and sitting limitations imposed by Dr. Ward, that would eliminate all work. (Tr. 3617-18). Similarly, if plaintiff had to shift positions at will from sitting, standing, or walking every 20 minutes in an 8-hour workday as Dr. Ward opined; was off-task 25% of the time as Dr. Ward opined; was limited to the standing, walking, and sitting restrictions imposed by Dr. Valentin; or needed to take an unscheduled break for 15 minutes, two or three time a day as Dr. Valentin opined, the VE testified each of those limitations individually would be work preclusive. (Tr. 3518-19). Remand for further administrative proceedings would serve no purpose other than to cause additional delay in a case that has been pending for over eight years. Plaintiff's claim for disability benefits has been the subject of two administrative hearings and has already been remanded once by this Court. Remanding the matter for a third hearing before the ALJ would serve no purpose in light of the procedural history of this matter and the extensive proceedings that have already occurred. *See Jodrey v. Comm'r of Soc. Sec.*, No. 1:12-cv-725, 2013 WL 5981337, at *22 (S.D. Ohio Nov. 12, 2013), *report and Recommendation adopted*, 2013 WL 6632633 (S.D. Ohio Dec. 17, 2013) (citing *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir.

2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.")).  *See also Lesmeister v. Barnhart*, 439 F. Supp. 2d 1023, 1031 (C.D. Cal. 2006) (finding that reversal and remand for an immediate award of benefits was proper where the court had previously remanded the matter "to afford the Commissioner an opportunity to address the onset date issue, but following remand, the ALJ failed to meaningfully comply with the Court's Order") (citing *Giampaoli v. Califano*, 628 F.2d 1190, 1196 (9th Cir. 1980)); *Filocomo v. Chater*, 944 F. Supp. 165, 171 (E.D. N.Y. 1996) (court found reversal rather than another remand was the appropriate remedy when several years had passed since the plaintiff applied for benefits, the matter had previously been remanded to the Commissioner, the Commissioner had failed to follow the Court's directives to properly apply the treating physician rule, and the Commissioner had not obtained or relied on any evidence contrary to the treating physicians' opinions).  The Court therefore remands this case for an immediate award of benefits.

## IT IS THEREFORE ORDERED THAT:

1.  The decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for an award of benefits consistent with this opinion.

Date:  8/21/2021

Karen L. Litkovitz
Chief United States Magistrate Judge